**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JANICE H. STRUBE,** | ) | **Case No. 10 C 50324** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Hon. P. Michael Mahoney** |
| **v.** | ) | **U.S. Magistrate Judge** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I.     Introduction

Janice H. Strube ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny her claim for Disability Insurance

Benefits ("DIB"), under Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This

matter is before the Magistrate Judge pursuant to the consent of both parties. *See* 28

U.S.C. § 636(c); Fed. R. Civ. P. 73.

### II.     Administrative Proceedings

Plaintiff initially filed for DIB on April 23, 2007, alleging an onset date of March

19, 2006, due to bipolar disorder. (Tr. 24, 74, 125-27.) This claim was denied by the

Social Security Administration by notice dated July 17, 2007, and subsequently on

reconsideration dated October 29, 2007. (Tr. 24.) Following her application's denial,

Claimant timely requested and appeared at a hearing before Administrative Law Judge

("ALJ") Steven H. Templin on June 1, 2009. (Tr. 38-73.) During the hearing, the ALJ

heard testimony from medical expert Dr. Kathleen O'Brien, Claimant, who was represented by Mr. Barry L. Ellinger of Binder and Binder, and vocational expert ("VE") Ms. Wysoff. (Tr. 38-73.)

On December 11, 2009, the ALJ issued a written decision denying Claimant's application, finding Claimant was not disabled under sections 216 (i) and 223 (d) of the Social Security Act. (Tr. 24-31.) Claimant timely requested review of the ALJ's decision, submitting a memorandum and additional evidence with the appeal. (Tr. 20, 253-61, 465-80.) The ALJ's decision became the final determination after Claimant's review was denied by the Appeals Council on August 4, 2010. (Tr. 5-8.) Claimant now files a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

III.    **Background**

Claimant was born on September 17, 1957, making her fifty-two at the time of the ALJ's decision. (Tr. 49, 125.) Claimant completed high school in 1975, and attended two years of college which resulted in her achieving an Associate Commercial Art Photography degree in May of 1978. (Tr. 49-51.) During the time of the hearing, Claimant lived at her home, with her husband, Dan Strube. (Tr. 59-60.)

Claimant's records pertaining to her work history indicate that from June of 1996 to August of 2005, she was employed as an Administrative Support Assistant ("ASA") for a state agency in Alabama. (Tr. 196-197.) The record shows that as an ASA Claimant provided clerical support to employment development coordinators and rehab engineers, scheduled appointments, transcribed reports, created resumes, researched products,

maintained files, entered and maintained data in computer systems, and assisted with job readiness. (Tr. 197.) The record also shows, as an ASA Claimant lifted and carried stacks of paper up to 100 feet a couple times a week, and lifted and carried boxes weighing up to twenty pounds from the first floor to third floor once a month. (Tr. 197.)

Prior to her employment as an ASA, Claimant worked as a clerk typist for a state agency in Alabama. (Tr. 196, 198.) As a clerk typist, Claimant "performed clerical support for social workers and psychologists, typed reports, dispatched state vehicles, assisted with payroll, filed, copied, [entered computer data], and answered and directed phone calls." (Tr. 198.) Claimant also carried stacks of documents which weighed up to ten pounds, for approximately 100 feet, sometimes several times a day. (Tr. 198.)

During the hearing, Claimant testified that since March 29, 2006, she has briefly been employed twice. (Tr. 46-47.) Once during the calendar year of 2006, from August to October, Claimant was employed as a bank teller for Citizens Bank of Sangamon. (Tr. 47.) However, Claimant testified that the speed and accuracy required, to successfully handle customer's transactions, was too difficult for her to maintain. (Tr. 47-48.) Claimant also testified regarding her three week employment as an optician's assistant in 2007. (Tr. 48-49.) She testified that she was let go because her employer said, "[she] couldn't handle it", referring to the speed and concentration required to effectively sort and organize shipments of customer's glasses. (Tr. 49.)

Claimant testified that she has been seeing therapist Amy Heiman about twice a month for approximately a year. (Tr. 51.) Claimant stated that Ms. Heiman recommended that she stick to a daily routine, with plans and goals in order to "feel better". (Tr. 64-65.) The ALJ noted that the record is absent any communication between Claimant's

psychiatrist, Dr. Singha, and Ms. Heiman. (Tr. 65.) Claimant testified she knew Ms. Heiman and Dr. Singha have communicated with each other regarding her treatment in the past. (Tr. 65.) As for her psychiatrist, Dr. Sinha, Claimant testified that she visited him "once a month to two months", but when he prescribed new medications Claimant would go in to see him sooner. (Tr. 51.)

Claimant testified how her bi-polar disorder has had an affect on the physical aspect of her daily life. (Tr. 52-63.) She stated she experiences "big mood swings" on a day-to-day basis, during which she will go from feeling "extremely up" or "manic" to feeling depressed, to the point where she struggles to get the motivation to get out of bed in the morning. (Tr. 52-53.) When feeling "manic" she experienced issues with thoughts of grandeur, obsessive talking, racing thoughts, and difficulty dealing with people. (Tr. 53.) These "manic" periods can last anywhere from days to weeks. (Tr. 53.) In regard to the depressed periods, Claimant stated they can last up to as much as a month. (Tr. 53.) Claimant maintained that she experiences them "[a]t least a view times a week." (Tr. 53.) When attempting to do certain tasks, like cooking, she testified that at times her "manic" and "low" moods "converge" which cause her to experience "anxiety and a racing heartbeat." (Tr. 55.) Claimant stated that these episodes forced her to sit down, and then get up and walk around, and then sit back down. (Tr. 55.) These occurrences made it difficult for Claimant to get anything done, because in addition to being distracted, it takes her a day or two to attain her normal level of functioning. (Tr. 55.) Claimant maintained these episodes occur at least ten days out of the month. (Tr. 56.)

When asked about her ability to interact with others, Claimant testified that her bipolar disorder creates difficulties in that arena as well. (Tr. 56.) Claimant said her biggest issue is listening to others. (Tr. 56.) However, Claimant stated that she generally has had no issue with getting along with her friends, family or co-workers at her previous jobs. (Tr. 57.)

Claimant stated her doctors have told her that bipolar disorders can get excessively worse with age, and Claimant maintained she has "definitely felt that." (Tr. 57.) When asked if she experiences anxiety attacks, Claimant said she does and that they occur hand-in-hand with her mood swings. (Tr. 57.) She testified that she has had anxiety attacks as long as she could remember in her life, although they have increased in duration as she has aged. (Tr. 58.) A severe anxiety attack will last for a couple of hours, but Claimant stated the repercussions of such an attack linger for a matter of days. (Tr. 58.) Claimant described these repercussions as a racing heart, and feeling like she needs to "go outside or she will die." (Tr. 58.) Claimant believed that these attacks are brought on by changes in her daily routine, and other things like financial stress. (Tr. 58.)

As for her daily routine, Claimant said she does not quite have a typical day, because she does not wake up or go to bed at a set time. (Tr. 58.) Claimant elaborated that sometimes she will sleep for twelve hours a night and other times she will sleep intermittently throughout the night for roughly seven hours. (Tr. 59.) On average, Claimant admitted that she does not feel well-rested after a night's sleep. (Tr. 59.) When Claimant eventually gets out of bed in the morning, she said she will sometimes spend time with her husband, before he goes to work at 11:00 a.m. (Tr. 60.) She will then normally drink some coffee and make a simple breakfast. (Tr. 60.) Depending on her

mood and agenda for the day, she will get dressed for the day and take a shower (she testified that she bathes about five times a week.) (Tr. 60.) She stated that when she feels like it, she will do chores, but that is generally only once or twice a month. (Tr. 61.) When asked how she spends the rest of her days, Claimant said she watches television, feeds and walks her dogs, reads the newspaper or a book if she can concentrate on that particular day (she stated she reads about six novels a year), and about once a week she attends church services. (Tr. 61-62.) Outside of walking her dogs, attending church and going to the doctor, she leaves the house to go grocery shopping, and occasionally visit with her neighbor. (Tr. 62.) Claimant is capable of both leaving the house and driving unaccompanied. (Tr. 62.) As for the household bills, Claimant's husband is and always has been responsible for handling them. (Tr. 63.)

### A.    Medical Expert – Dr. O'Brien

When asked to identify Claimant's RFC, Dr. O'Brien opined that she believed "[Claimant] was capable of simple, unskilled work and would probably not do well in an occupation with high productivity quotas, but could probably handle average quotas." (Tr. 41.) Dr. O'Brien testified that she did not find any reports that Claimant could not interact with others. (Tr. 43.) The non-examining medical expert opined that Claimant's treatment provider records do not indicate moderate or marked impairment, due to the fact that Claimant's progress notes reflect that she is seeing a psychiatrist "no more often than once a month and frequently once every other month". (Tr. 43.) Dr. O'Brien also noted that since her hospitalization for restless leg syndrome, there has been no indication that she has required anything more than visits for medication. (Tr. 43.) Dr.

6

O'Brien opined that because the record as a whole shows that Claimant's doctors were seeing Claimant no more than once a month, for medication management only, the record is not indicative of a markedly impaired person. (Tr. 44-46.) She went on to state, "generally speaking, if someone is so impaired that they can't function, on a day-to-day basis, at a simple task, then I would be looking at records that said that there was a lot more intervention going on than there is in this case." (Tr. 46.) However, Dr. O'Brien admitted that to find that someone is incapable of working because of a psychological impairment is an "individual situation", and her opinion was based in terms of a general analysis. (Tr. 46.)

**B.**     **Vocational Expert - Ms. Wysoff**

Vocational Expert ("VE"), Ms. Wysoff also testified before the ALJ. (Tr. 67-73.) The VE stated the bank teller position Claimant held in 2006 had a specialized vocational preparation ("SVP") of five and was skilled. (Tr. 67.) As for her employment as an optician's assistant, the SVP was six, and was also skilled. (Tr. 67.)  The VE testified that both of these positions were beyond the RFC described by Dr. O'Brien. (Tr. 67.) In terms of the Claimant's past relevant work, as an administrative support assistant and clerk typist, the VE said they were both sedentary, semi-skilled work with a SVP of four. (Tr. 68.) When asked if she believed that Claimant could meet the mental demands of either of those occupations, the VE did not believe so because they were semi-skilled positions, and Dr. O'Brien's RFC assessment stated Claimant could only perform simple, unskilled work. (Tr. 68.) The VE stated no transferable skills existed, because an individual can not transfer skills from a semi-skilled position to an unskilled position. (Tr. 68.)

The VE was able to provide several examples of simple, unskilled work which

existed in substantial numbers in the national economy. (Tr. 69.) While there had been no discussion of physical limitations, the VE included only light exertional level jobs. (Tr. 69.) The VE testified that 13,000 hospital cleaner, 6,800 cafeteria attendant, and 3,000 mail sorter jobs existed within a thirteen county area in and around Chicago, and that these positions existed throughout the national economy. (Tr. 69.) The VE stated none of these jobs had a high productivity requirement. (Tr. 70.) The VE was also asked if the individual described by the ALJ continually missed work three times a month, due to psychological issues, would it be possible for that individual to hold down a part-time or full-time job. (Tr. 70.) The VE said that individual would not be able to remain employed on a part- or full-time basis with that sort of an attendance record. (Tr. 70.) Finally, the VE was asked if the individual was required to be off task, because she was unable to maintain focus, in addition to any allowed breaks, for up to twenty-five percent of the work day, would she be able to return to any of Claimant's past jobs. (Tr. 71.) The VE did not believe that individual would be unable to perform any of Claimant's past jobs. (Tr. 71.)

At the initiation of the hearing, Claimant submitted Exhibit No. 11F, which contained a letter from Claimant's counselor, Amy Heiman, M.S., in which Ms. Heiman opined Claimant was totally disabled, and also a "Psychiatric/Psychological Impairment Questionnaire" completed by Ms. Heiman. (Tr. 38, 418, 419-26.) After the hearing, Claimant also submitted Exhibits 14F-16F. (Tr. 28.) These exhibits contained additional treatment notes from Ms. Heiman, and treatment notes from one of Claimant's psychiatrists, Dr. Sihna. There is no indication in the record that the ME had the opportunity to review these documents.

## IV.   **Medical Evidence**

The earliest records of Claimant's alleged impairments are from March 2006, when Claimant was hospitalized for a psychotic episode that involved hyperactivity, racing thoughts, increased self-esteem, grandiosity, and paranoia. (Tr. 301, 304, 315-18, 333-36, 410, 414.) At this point, Claimant was prescribed Dilantin[1]. (Tr. 315.) A comprehensive psychological examination was performed, following Claimant's hospitalization earlier in the month, by psychiatrist Ramoncito Ocampo M.D., on March 19, 2006. (Tr. 315-317.) Dr. Ocampo diagnosed Claimant with bipolar disorder, type I, with a possible diagnosis of bipolar disorder, type II, and assigned Claimant a Global Assessment of Functioning ("GAF") of 60[2]. (Tr. 318.) Claimant was subsequently prescribed Depakote[3]. (Tr. 318.)

On April 26, 2006, Dr. Ocampo noted that Plaintiff's speech was loud, hypomatic and pressured. (Tr. 311.) Dr. Ocampo then discontinued Depakota, and prescribed Trileptal[4] and Risperdal[5]. (Tr. 311.) On May 14, 2006, Dr. Ocampo reported that Claimant's mood was good, and had no mood swings or racing thoughts. (Tr. 311.) In September of 2006, Dr. Ocampo noted Claimant was noncompliant with her medication. (Tr. 314.) On that date, he also reported that Claimant had started a new job as a bank

---

[1] Dilantin (phenytoin) is an anti-epileptic drug, also called an anticonvulsant. It works by slowing down impulses in the brain that cause seizures. Drugs.com, http://www.drugs.com/dilantin.html

[2] A Global Assessment of Functioning (GAF) scores range from 0 to 100. A GAF score ranging from 51 to 60 indicate moderate symptoms or moderate difficulty in social, occupational , or school functioning. American Psychiatric Association, Diagnonstic and Statistical Manual of Mental Disorders 382-97 (2000, 4th Ed., Text revision) "DSM-IV-TR")

[3] Depakote (divalproex sodium) can be used to treat manic episodes related to bipolar disorder (manic depression), and to prevent migraine headaches. Drugs.com, http://www.drugs.com/depakote.html.

[4] Trileptal (oxcarbazepine) is in a group of drugs called anticonvulsants, or antiepileptic drugs. It works by decreasing nerve impulses that cause seizures. Drugs.com, http://www.drugs.com/trileptal.html.

[5] Risperdal (risperodine) is an antipsychotic medication. It is an "atypical antipsychotic". It works by changing the effects of chemicals in the brain. Risperdal is used to treat schizophrenia and symptoms of bipolar disorder (manic depression). Drugs.com, http://www.drugs.com/risperdal.html.

teller, but was not very happy with it. (Tr. 314.) Dr. Ocampo then started Claimant on

Effexor[6]. (Tr. 314.)  During Claimant's next visit with Dr. Ocampo, in October of 2006,

she reported that she had lost her job at the bank, and that she was feeling depressed, with

no energy or motivation. (Tr. 314.) Dr. Ocampo observed psychomotor retardation, and

Risperdal and Trileptal were discontinued. (Tr. 314.) Claimant reported having a stable

mood, with no anxiety, and more energy and motivation during a visit with Dr. Ocampo,

in November of 2006. (Tr. 313)

On February 21, 2007, Dr. Ocampo noted Plaintiff was very talkative and opined

that she was hypomatic, although she maintained good control of her impulses. (Tr. 313.)

Dr. Ocampo subsequently prescribed Trileptal, with the possibility of prescribing an

antipsychotic medication at the next visit. (Tr. 313.) During a visit with Claimant on

March 21, 2007, Dr. Ocampo noted that Claimant was still hypomanic and very talkative,

with complaints of poor sleep. (Tr. 313.) During an April 12, 2007 visit, Claimant was

described as slightly hypomanic with hyperactivity; at this point, Zyprexa[7] was

discontinued and replaced with Abilify[8], while Trileptal was continued. (Tr. 312.) On

May 10, 2007, Dr. Ocampo noted that Claimant was both hypomanic and hypoverbal, but

was less grandiose with a "significant decrease in racing thoughts." (Tr. 310.) Dr.

Ocampo decreased Trileptal and increased Abilify. (Tr. 310.)

---

[6] Effexor (venlafaxine) is an antidepressant in a group of drugs called selective serotonin and
norepinephrine reuptake inhibitors (SSNRIs). Venlafaxine affects chemicals in the brain that may become
unbalanced and cause depression. Effexor is used to treat major depressive disorder, anxiety, and panic
disorder. Drugs.com, http://www.drugs.com/effexor.html.

[7] Zyprexa (olanzapine) is an atypical antipsychotic medication used to treat the symptoms of psychotic
conditions such as schizophrenia and bipolar disorder (manic depression). Drugs.com,
http://www.drugs.com/zyprexa.html.

[8] Abilify (aripiprazole) is an antipsychotic medicationused to treat the symptoms of psychotic conditions
such as schizophrenia and bipolar disorder (manic depression). Drugs.com,
http://www.drugs.com/abilify.html

During Claimant's next visit, in June 2007, Dr. Ocampo completed a Psychiatric Report. (Tr. 322-23.) During the evaluation, Claimant was hyperverbal with pressured speech, had an elevated mood, laughed at inappropriate times, and her thought process demonstrated "loose associations". (Tr. 332-33.) When assessing Claimant's "Level of Daily Functioning" Dr. Ocampo stated Claimant can take care of herself (grooming, hygiene, and preparing her own meals), but cannot go shopping because she is hypomanic. (Tr. 322.) Dr. Ocampo opined a diagnosis of bipolar disorder, type I, a history of manic episodes with psychosis, and reported treatment with an antipsychotic (Ability) and mood stabilizer (Trileptal) with good response. (Tr. 325.) When describing Claimant's "ability to do work related activities", Dr. Ocampo noted Claimant still had racing thoughts, was still hypomanic with grandiosity, and had poor attention and concentration. (Tr. 325.)

On June 13, 2007, Claimant reported decreased energy and sleep; however, Dr. Ocampo decreased Claimant's Abilify dosage after noting no signs or symptoms of hypomania or grandiosity. (Tr. 330) Claimant sought emergency treatment on July 2, 2007, due to restless leg syndrome as an adverse reaction to her antipsychotic medications. (Tr. 359.)

In July of 2007, a non-examining state agency psychologist, M.A. Whatron, Psy. D., assessed the following limitations:

- moderate restriction of activities of daily living;

• moderate difficulties in maintaining social functioning;

    • moderate difficulties in maintaining concentration,
    persistence, or pace; and

    • one or two episodes of decompensation each of extended
    duration.

    (Tr. 337-350.)

This assessment was affirmed by John Tomassetti, Ph.D., in October of 2007. (Tr. 366-68.)

In August of 2007, Claimant visited Dr. Ocampo and reported that her sleep and appetite were good. (Tr. 353.) She also stated she was feeling down, with no drive, energy, or motivation, but denied racing thoughts as well as suicidal and homicidal ideations. (Tr. 353.) Cogentin[9] and Abilify were then discontinued, and Lamictal[10] and Wellbutrin[11] were prescribed in addition to Trileptal. (Tr. 353.) On October 25, 2007, Dr. Ocampo again noted Claimant was hypomanic, in addition to being very talkative and argumentative. (Tr. 371.) Trileptal was increased and Geodon[12] was prescribed. (Tr. 371.) During Claimant's next visit with Dr. Ocampo on November 8, 2007, Dr. Ocampo noted marked improvement in mood, however also noted hypomania, with some racing thoughts and hyperactivity. (Tr. 371.) On November 28, 2007, Dr. Ocampo described Claimant as hypomanic with pressured speech and grandiosity, and again noted Claimant as being very talkative and hyperactive. (Tr. 372.) During this visit, Trileptal was

---

[9] Benztropine (Cogentin) is used to treat the symptoms of Parkinson's disease, such as muscle spasms, stiffness, tremors, sweating, drooling, and poor muscle control. Drugs.com, http://www.drugs.com/mtm/benztropine.html

[10] Lamictal (lamotrigine) is an anti-epileptic medication, used either alone or in combination with other medications to treat epileptic seizures and to delay mood episodes in adults with bipolar disorder (manic depression). Drugs.com, http://www.drugs.com/lamictal.html.

[11] Wellbutrin (bupropion) is an antidepressant used to treat major depressive disorder and seasonal affective disorder. Drugs.com, http://www.drugs.com/wellbutrin.html.

[12] Geodon (ziprasidone) is an antipsychotic medication used to treat schizophrenia and the manic symptoms of bipolar disorder (manic depression). Drugs.com, http://www.drugs.com/geodon.html.

increased and Geodon was continued. (Tr. 372.) In December 2007, Claimant showed some significant improvement in her mood, was less talkative and grandiose, reported no racing thoughts and stated her sleep, and appetite were good; however, she stated she was also anxious and restless (Tr. 371.) At this time, Trileptal was decreased. (Tr. 371.)

In an undated letter, that appears to be from December of 2007, Dr. Ocampo noted Claimant was diagnosed with bipolar disorder, type I. (Tr. 373.) He then wrote Claimant was hypomanic with pressured speech and grandiosity, was not a danger to herself or others, and had good support from her husband. (Tr. 373.) He also noted Claimant's medications could not be maximized because of adverse side effects, and that Claimant was compliant with follow-ups and medication. (Tr. 373.) Finally, Dr. Ocampo stated Claimant's treatment was to be taken over by psychiatrist Dr. Shobha Sinha M.D., as of January 2008. (Tr. 373.)

In December of 2007, Dr. Ocampo completed a "Psychiatric/Psychological Impairment Questionnaire", stating that he had treated Claimant monthly since March 2006, and most recently in December of 2007. (Tr. 377-84.) Dr. Ocampo assigned a current GAF score of 50 to 60[13] and reported that the lowest GAF assigned to Claimant over the past year was 40[14]. (Tr. 377.) Dr. Ocampo further found Claimant was markedly limited regarding the ability to:

> • remember locations and work-like procedures;
> • understand and remember one- or two-step instructions;

---

[13] A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (2005, 4th ed.) ("DSM-IV")

[14] A GAF of 40 indicates some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed individual avoids friends, neglects family and is unable to work.) American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (2005, 4th ed.) ("DSM-IV")

• understand and remember detailed instructions;
• carry out simple one- or two-step instructions;
• carry out detailed instructions;
• maintain attention and concentration for extended periods;
• perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance;
• sustain ordinary routine without supervisions;
• work in coordination with or proximity to others without being distracted by them;
•interact appropriately with the general public;
• get along with co-workers or peers without distracting them or exhibiting behavioral extremes;
• maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;
• respond appropriately to changes in the work setting; and
• set realistic goals or make plans independently.

(Tr. 380-382.)

Dr. Ocampo found that Claimant was moderately limited with respect to the ability to:

• make simple work related decisions;
• complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
• ask simple questions or request assistance;
• accept instructions and respond appropriately to criticism from supervisors;
• be aware of normal hazards and take appropriate precautions; and
• travel to unfamiliar places or use public transportation.

(Tr. 380-82.)

Dr. Ocampo also noted that Claimant's medications could not be increased due to adverse side effects. (Tr. 382, 384.) He further opined that Claimant would be absent from work more than three times a month, and that Claimant would be incapable of tolerating even a "low stress" work environment due to her hypomania. (Tr. 384.)

Claimant began seeing licensed clinical professional counselor, Amy Heiman, M.S., in June of 2008. (Tr. 452.) The record reflects that Claimant saw Ms. Heiman four

14

times in July, twice in August, once each in September, October, November, and December of 2008. (Tr. 448-50.) In a letter written on August 8, 2008, Ms. Heiman stated it was essential for Claimant to be involved in regularly scheduled outpatient therapy in order to appropriately monitor her symptoms, and maintain her highest level of functioning. (Tr. 460.) She then stated that Claimant had experienced financial hardships that may interfere with her ability to attend counseling, and that disability benefits would "help her achieve the level of care she requires". (Tr. 460.)

In August 2008, Dr. Sinha's progress notes indicate Claimant had an improved mood and decreased verbal aggressiveness. (Tr. 441.) However, his notes also indicate Claimant was still "intense" with tangential thoughts. (Tr. 441.) On this date, Dr. Sihna increased Claimant's Seroquel prescription. (Tr. 441.) On October 8, 2008, Dr. Sinha's notes indicated that although Claimant reported feeling drowsy in the morning, her mood was calmer and less aggressive while taking Seroquel and Trileptal. (Tr. 440.) On November 19, 2008, Claimant reported variable sleep, but an overall stable mood. (Tr. 440.)


In February of 2009, Dr. Sinha considered prescribing Abilify, however noted that Claimant was resistant to changing her medications. (Tr. 439.) Dr. Sinha's notes indicated Claimant's mood was calm but "edgy", she had no psychotic features, and she had no suicidal or homicidal ideations. (Tr. 439.)

The record contains a second letter written by Ms. Heiman, this one dated April 21, 2009. (Tr. 418.) Therein, Ms. Heiman stated that she believed, "[in her] best medical

opinion, [Claimant] is totally disabled[.]" (Tr. 418.) Ms. Heiman also indicated that drug

and/or alcohol use was not a material cause of Claimant's disability. (Tr. 418.)

In a "Psychiatric/Psychological Impairment Questionnaire", Ms. Heiman assigned

Claimant a current GAF score of 55 and described Claimant's prognosis as guarded. (Tr.

419.) With regard to memory and understanding, Ms. Heiman offered no opinion. (Tr.

422.) Ms. Heiman found that Claimant was markedly limited with respect to the ability

to:

> • maintain attention and concentration for extended periods;
> • perform activities within a schedule, maintain regular attendance, and be
> punctual within customary tolerance;
> • complete a normal workweek without interruptions from psychologically
> based symptoms and to perform at a consistent pace without an
> unreasonable number and length of rest periods;
> • accept instructions and respond appropriately to criticism from
> supervisors;
> • get along with co-workers or peers without distracting them or exhibiting
> behavioral extremes; and
> • set realistic goals or make plans independently.
>
> (Tr. 422-24.)

Ms. Heiman found Claimant to be moderately limited with respect to the ability to:

> • sustain ordinary routine without supervision;
> • work in coordination with or proximity to others without being distracted
> by them;
> • interact appropriately with the general public; and
> • maintain socially appropriate behavior and to adhere to basic standards
> of neatness and cleanliness.
>
> (Tr. 422-24.)

Ms. Heiman found Claimant to be mildly limited with respect to the ability to:

> • ask simple questions or request assistance; and
> • be aware of normal hazards and take appropriate precautions.
>
> (Tr. 422-24.)

In May of 2009, Dr. Sihna also completed a "Psychiatric/Psychological Impairment Questionnaire". (Tr. 429-37.) Dr. Sihna noted his treatment of Claimant began in January of 2008 and has seen Claimant every two months as of the date of the questionnaire. (Tr. 429.) Claimant was assigned a current GAF of 50, with the highest over the past year of 60. (Tr. 429.) Dr. Sihna's prognosis of Claimant was guarded, and stated Claimant's symptoms include:

- mood lability;
- poor judgment and insight;
- easily distracted;
- racing thoughts;
- angry and aggressive outbursts; and
- grandiose delusions.

(Tr. 431.)

Additionally, Dr. Sinha found Claimant was markedly limited in all but two categories, which were the ability to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness, in which he noted Claimant was moderately limited. (Tr. 433.) With regard to stress, Dr. Sihna opined, "[Claimant] is unable to tolerate event the slightest stress." (Tr. 434.) When asked how often Claimant would be likely to be absent from work Dr. Sihna wrote, "[Claimant is] unable to work consistently" and that the limitations noted applied since 2006 when Claimant experienced her first episode of significant deterioration. (Tr. 436.)

During a visit with Dr. Sihna in May of 2009, Claimant reported feeling "sluggish", with no motivation, and that she was sleeping more. (Tr. 462.) She also reported that her husband was helping monitor her medication usage. (Tr. 462.) Claimant's medication was changed to a different type of Seroquel with Trileptal and

Klonopin[15] continued. (Tr. 462.) On July 22, 2009, Claimant reported completing chores with increased energy; however, Dr. Sihna noted her speech was tangential and pressured, with racing thoughts. (Tr. 462.) Also, Dr. Sihna reported Claimant has been writing with possible paranoid thoughts, but "is being monitored." (Tr. 462.) Claimant's Seroquel prescription was increased. (Tr. 462.) In September of 2009, Dr. Sihna noted Claimant's speech was slower and clearer, and her mood was pleasant. (Tr. 462.) Her Seroquel was again increased. (Tr. 463.)

**V.      Standard of Review**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner."). The court may remand to the Commissioner where there is a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. 42 U.S.C. § 405(g).

---

[15] Klonopin (clonazepam) is in a group of drugs called benzodiazepines (ben-zoe-dye-AZE-eh-peens) and is used to treat seizure disorders or panic disorder. Drugs.com, http://www.drugs.com/klonopin.html.

18

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**VI.**     **Framework for Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner normally proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a

severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors.

## VII.    Analysis.

### A.    Step One: Is Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In his decision, the ALJ acknowledged that Claimant had been employed on two separate occasions, following her alleged onset date of March 19, 2006. (Tr. 27, 46-49.) The VE described the bank teller position, which Claimant testified she had for three months in 2006, as skilled with a SVP of five. (Tr. 27, 67.) With respect to the Claimant's three week employment at the optical store, the VE described this work as skilled with a SVP of six. (Tr. 27, 67.) Claimant testified that she was let go from both positions because she experienced difficulties in maintaining the speed and accuracy required to perform either job. (Tr. 46-49.) The ALJ's RFC determination of Claimant was that "[Claimant] would be capable of sustaining the performance of simple, unskilled

work which did not require her to maintain high productivity quotas". (Tr. 28; 20 CFR 404.1545.) The ALJ found both of these employment periods to be unsuccessful work attempts pursuant to SSR 05-02. (<u>Titles II & XVI: Determination of Substantial Gainful Activity If Substantial Work Activity Is Discontinued or Reduced-Unsuccessful Work Attempt</u>, SSR 05-02 (S.S.A Feb. 28, 2005.); Tr. 27) Thus, the ALJ found that Claimant was not engaged in substantial gainful activity at any time material to his decision. (Tr. 27) The ALJ's decision at this step is disputed by neither party, and therefore the ALJ's Step One determination is affirmed.

B.      **Step Two: Does Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404 1520 (a)(ii). A severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520 (c). The claimant's age, education, and work experience are not considered in

making a Step Two severity determination. Id. If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends. *Id.*

In performing the Step Two analysis, the ALJ found that Claimant suffered from Bipolar Disorder, type I, since March of 2006. (Tr. 27.) The ALJ appropriately relied on the medical evidence in the record, the evidence submitted by Claimant post-hearing, from medical and non-medical sources, and the reviewing mental health consultant's conclusions to find that Claimant had been suffering from a "severe" impairment, or its

equivalent at all time relevant to his decision. (Tr. 27; 20 CFR 404.1520(c)). This finding

is not challenged by either party, and this court finds no reason to disturb it. Substantial

evidence exists to support the ALJ's determination that Claimant suffers from a severe

impairment. Therefore, the ALJ's finding as to Step Two of the analysis is affirmed.


**C.     At Step Three the ALJ determines whether Claimant's impairments meet or equal the criteria of any in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; At Step Four the ALJ determines Claimant's Residual Functional Capacity and Determines if Claimant is Capable of Performing any Past Relevant Work; At Step Five the ALJ Determines Whether There are jobs that Exist in Significant Numbers in the National Economy to Which the Claimant Could Adapt and Perform.**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R.

pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems,

impairments which are considered sever enough *per se* to prevent a person from doing

significant gainful activity. 20 C.F.R. § 404.1525 (a). The listings streamline the decision

process by identifying certain disabled claimants without need to continue the inquiry.

*Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment

meets or is medically equivalent to a listed impairment, then the claimant is found to be

disabled and the inquiry ends; if not, the inquiry moves on to Step Four.


In performing the Step Three analysis, the ALJ determined that Claimant's

impairments, even in combination, neither met nor equaled the criteria of any in the

Listing of Impairments in 20 C.F.R. Part 404, SubPart P, Appendix 1. (20 C.F.R.

404.1525 and 404.1526.) Under §12.04, paragraph B, Claimant's impairments must

result in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration,
persistence, or pace; or
4. Repeated episodes of decompensation, each of extended
duration;

20 C.F.R. § 404 app. 1

Specifically, under §12.04 of the Listing of Impairments, paragraph B, the ALJ relied on

the testimony of the ME to find that Claimant had:

• moderate restriction of activities of daily living;
• moderate difficulties in maintaining social functioning;
• moderate difficulties in maintaining concentration,
persistence, or pace; and
• one episode of decompensation.

(Tr. 27.)

With respect to the "C Criteria" of §12.04, the ALJ found the requisite criteria to be

unmet. (Tr. 27.)

At Step Four, the ALJ determines whether the claimant's residual functional

capacity ("RFC") allows the claimant to return to past relevant work. Residual functional

capacity is a measure of the abilities which the claimant retains despite his or her

impairments. 20 C.F.R. § 404.1545 (a). The RFC assessment is based upon all of the

relevant evidence, including objective medical evidence, treatment, physicians' opinions

and observations, and the claimant's own statements about her limitations. Id. Although

medical opinions bear strongly upon the determination of RFC, they are not conclusive;

the determination is left to the Commissioner who must resolve any discrepancies in the

evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527 (e) (2);

see Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995).

In performing his Step Four analysis, the ALJ ruled Claimant is unable to perform

any of her past relevant work. (Tr. 30.) The ALJ found that Claimant has the RFC to

perform a range of unskilled work as defined in the regulations at 20 C.F.R. 404.1521(b).

20 C.F.R. 404.1545. Additionally, the ALJ decided, Claimant should be limited to

unskilled work that does not require Claimant to maintain high productivity quotas. (Tr.

28.)

At Step Five, the ALJ relies on Claimant's age, education level, work experience,

medical record, and the testimony of the VE to determine if Claimant could perform

substantial gainful work that exists in the national economy. See 20 C.F.R. Pt. 404,

Subpt. P, App. 2, Table No. 2, Rule 201.21, 201.28.

During his Step Five analysis, the ALJ held that, upon consideration of

Claimant's age, education, work experience, and RFC, there are occupations at the

unskilled level, that exist in significant numbers in the national economy to which

Claimant could adapt and perform. (20 C.F.R. 404.1569 and 494.1569a; Tr. 30.)

Specifically, the ALJ noted 13,000 hospital cleaner jobs, 6,800 cafeteria attendant jobs,

and 3,000 mail sorter jobs in a thirteen-county area within metropolitan Chicago. (Tr.

30.)

In light of the ALJ's findings, Claimant argues the ALJ's determinations at Step

Three and Step Four were erroneous. With respect to Step Three, SSR 96-2p governs the

commonly referred to "Treating Physician Rule":

> An ALJ must consider the opinion of physicians of record
> and controlling weight must be given to the medical
> opinion of a treating physician if it is well supported with
> medical evidence and if it is not inconsistent with other
> substantial evidence.
>
> SSR 96-2p.

Claimant's treating psychiatrists and counselor are in accord that Claimant suffers from Bipolar Disorder, Type I. (Tr. 377-84, 429-37.) Dr. Ocampo, one of Claimant's treating psychiatrists, opined in a "Phychiatric/Psychological Impairment Questionnaire" that Claimant was:

> • markedly limited in all areas of understanding and memory;
> • markedly limited in six out of eight areas of sustained concentration and persistence, with the other two areas being moderately limited;
> • moderately-to-markedly limited in social functioning; and
> • moderately-to-markedly limited in adaptation.

(Tr. 380-82.)

Dr. Ocampo also opined that Claimant was not a malingerer, and that she would likely be absent from work more than three times per month as a result of her impairment or treatment. (Tr. 377-82.)

In an attempt to discredit Dr. Ocampo's opinion, the ALJ stated, "[o]nly one medical source suggests that Claimant's impairments have been so severe as to preclude, effectively, the Claimant's ability to work. That opinion is wholly inconsistent with the others of record, and I give it little weight." (Tr. 29.) This statement is contradictory to the record; for example, Dr. Sinha, has been Claimant's treating psychiatrist since January 23, 2008. (Tr. 429-37.) In a "Psychiatric/Psychological Impairment Questionnaire", Dr. Sinha opined that Claimant was:

> • markedly limited in all areas of understanding and memory;
> • markedly limited in all areas of sustained concentration and persistence;

• markedly limited in four out of five areas of social
functioning; and
• markedly limited in all areas of adaptation.

(Tr. 429-37.)

He further opined that Claimant was not a malingerer, experiences episodes of

decompensation, and noted, "[s]he is unable to tolerate even the slightest stress." (Tr.

429-437.)

Additionally to Claimant's treating psychiatrists, her counselor's records also

indicate that Claimant satisfies Listing §12.04, paragraph B. (Tr. 419-26.) In completing

a "Psychiatric/Psychological Impairment Questionnaire", Ms. Heiman found Claimant to

be markedly impaired in:

• three out of eleven categories pertaining to sustained
concentration and persistence;
• two out of the five categories of social interactions;
• and one out of the four categories pertaining to
adaptation.

(Tr. 419-26.)

Ms. Heiman also reported that Claimant experiences episodes of deterioration or

decompensation in work or work like settings which cause her to withdraw from that

situation and/or experience exacerbation of signs of symptoms. (Tr. 424.)

At Step Three, the ALJ failed to adequately credit Claimant's treating

psychiatrists' and counselor's opinions, even though their opinions appear to be

supported by medical evidence, and not inconsistent with other substantial evidence in

the record. (SSR 96-2p; Tr. 377-82, 429-37, 419-26.) There is not a logical bridge for this

rejection.

With respect to Step Three and Four, the ALJ relied solely on the ME's conclusory testimony. The ME, however, did not have the opportunity to review a complete case record. (Tr. 38, 72-73.) Pursuant to SSR 96-6p,

> "the opinion of a [non-examining] State agency medical or psychological consultant…may be entitled to greater weight than a treating source's medical opinion if the State agency medical…consultant's opinion is based on a review of a complete case record…" SSR 96-6p.

In his decision, at Step Four the ALJ found the ME's opinion to be the "most informed" and "consistent with the record as a whole". The ME's testimony was based upon an incomplete record. Particularly, the ME did not review important materials submitted by Claimant at the hearing (Exhibit 11F) and following the hearing (Exhibits 14F-16F). (Tr. 29, 38, 72-73, 417-426, 453-64.) The documents absent from the ME's review included relevant information such as treatment notes from Dr. Sihna and Ms. Heiman, and a "Psychiatric/Psychological Impairment Questionnaire" completed by Ms. Heiman. (Tr. 417-26, 453-64.) Therefore, the ALJ inappropriately afforded the opinion of non-examining Dr. O'Brien greater weight than SSR 96-6p permits.

Because the ALJ failed to follow SSR 96-2p and inappropriately relied on Dr. O'Brien's testimony in violation of SSR 96-6p, the ALJ's finding as to Step Three and Four are reversed and remanded for a new hearing. On remand, the ALJ should clearly follow SSR 96-2p, and any medical expert testifying should review the entire record and explain the basis of her findings in a non-conclusory manner, pursuant to SSR 96-6p.

**VIII.   Conclusion**

In light of the forgoing reasons, the ALJ's decision to deny benefits to Claimant is reversed and remanded for a new hearing, consistent with this opinion, and the mandates of SSR 96-2p and 96-6p. Claimant's motion for Summary Judgment on the administrative record and pleadings is granted in part. Commissioner's Motion for Summary Judgment is denied.

ENTER:

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE: July 30, 2013**